U.S. DISTRICT **COURT**
**N.D. OF N.Y.**
**FILED**

‛JAN 2̇3 2009

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LAWRENCE K. BAERMAN, **CLERK**
ALBANY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Number ✓ '09-CR-*29 (G∠S)* |
| v. | : | |
| | : | VIOLATIONS: 18 U.S.C. §§ 1341, |
| | : | 1343, 1346 (Honest Services Mail |
| JOSEPH L. BRUNO, | : | and Wire Fraud); Forfeiture |
| | : | Allegation |
| Defendant. | : | |
| | : | |
| | : | Eight Counts |

### INDICTMENT

THE GRAND JURY CHARGES THAT:

#### COUNTS ONE THROUGH EIGHT

#### Introduction

At all times relevant to this Indictment:

1.    Defendant JOSEPH L. BRUNO was a New York State Senator representing the 43rd Legislative District, a district covering Rensselaer County and parts of Saratoga County. Defendant JOSEPH L. BRUNO served in the Senate from on or about January 1, 1976 through on or about July 18, 2008. From on or about January 1, 1995 through on or about June 24, 2008, defendant JOSEPH L. BRUNO was also the Temporary President and Majority Leader of the New York State Senate ("the Senate Majority Leader"). As the Senate Majority Leader, defendant JOSEPH L. BRUNO was one of the three most powerful government officials in New York State.

2.     As a State Senator, defendant JOSEPH L. BRUNO's official duties included (a) voting and behind-the-scenes influence on legislation and budget appropriations, and (b) making recommendations to, negotiating with, and exercising legislative oversight of New York State agencies.  As the Senate Majority Leader, defendant JOSEPH L. BRUNO's official duties included (a) controlling the Senate's agenda and deciding whether bills would be brought to the Senate floor for vote; (b) together with the Governor and the Speaker of the Assembly, deciding which proposed budget appropriations would be funded in the annual state budget; and (c) deciding how funds allocated to the Senate Majority for, among other things, member and line items, would be disbursed.

3.     As a State Senator and later as the Senate Majority Leader, defendant JOSEPH L. BRUNO (and his staff) routinely met with various individuals and representatives of groups, including labor unions (which had recurring legislative interests), who asked that defendant JOSEPH L. BRUNO take action benefitting their interests regarding legislative, funding, contract, and regulatory issues pending before the New York State Legislature ("the Legislature") and New York State agencies.

### The Duty of Honest Services

4.  ·  The State of New York and its citizens had an intangible right to the honest services of defendant JOSEPH L. BRUNO.  Both as a New York State Senator and Senate Majority Leader, defendant

JOSEPH L. BRUNO had a fiduciary relationship with the State of New York and its citizens requiring:

> (A)   his disinterested decision making when performing his official duties; and
>
> (B)   full disclosure of the potential motivation behind, and material information relevant to, his official acts, including full disclosure of conflicts of interest, which would provide the citizens of the State of New York and other government officials with the information necessary to evaluate his motivations for official acts.

### The New York Public Officer's Code of Ethics and The Legislative Ethics Committee

5.   The New York Public Officer's Code of Ethics prohibited conflicts of interest: "No . . . member of the legislature . . . should have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest." N.Y. Pub. Off. Law § 74(2).

6.   The Code of Ethics also stated that a legislator should not:

> (A)   "accept other employment which will impair his independence of judgment in the exercise of his official duties," N.Y. Pub. Off. Law § 74(3)(a); or

3

(B) "use or attempt to use his official position to secure unwarranted privileges or exemptions for himself or others." N.Y. Pub. Off. Law § 74(3)(d).

7. Gifts to legislators were also restricted, and legislators could not "directly or indirectly, solicit, accept or receive any gift having a value of seventy-five dollars or more whether in the form of money, service . . . thing or promise, or in any other form, under circumstances in which it could reasonably be inferred that the gift was intended to influence him, or could reasonably be expected to influence him, in the performance of his official duties or was intended as a reward for any official action on his part." N.Y. Pub. Off. Law § 73(5). A knowing and intentional violation of this subdivision could result in civil penalties or was punishable as a Class A misdemeanor. N.Y. Pub. Off. Law § 73(14).

8. The Legislative Ethics Committee was a bipartisan committee consisting of eight legislators appointed equally by the Senate Majority Leader, the Speaker of the Assembly, and the minority leaders of both the New York State Senate and Assembly. Legislators were required to file annual statements of financial disclosure with the Legislative Ethics Committee declaring, among other things: in response to question four, "any office, . . . partnership, or position of any nature held by the [legislator] with any firm, corporation, association, partnership or other

organization other than the State of New York;" in response to question five, "the name, address and description of any occupation, employment . . . trade, business or profession engaged in by the [legislator];" in response to question thirteen, "the nature and amount of any income in EXCESS of $1,000 from EACH SOURCE for the [legislator] . . . for the [prior] year;" and in response to question nine, "each source of gifts . . . in EXCESS of $1,000, received during the [prior year]" including the "Name of Donor," "Address," "Nature of Gift," and "Category of Value of Gift." N.Y. Pub. Off. Law § 73-a; N.Y. Leg. § 80 (1989); N.Y. Leg. Ethics Committee Form 1. A false statement on an annual statement of financial disclosure made knowingly and willfully with intent to deceive could result in civil penalties or was punishable as a Class A misdemeanor. N.Y. Pub. Off. Law § 73-a(4).

9.    The Legislative Ethics Committee, upon written request from legislators, issued written advisory opinions regarding the application of Sections 73, 73-a, and 74 of the Public Officers Law to financial interests, including potential employment, contemplated by legislators. *See* N.Y. Leg. § 80, ¶14 (1989).

### Firms Providing Financial Services to Union Funds

10.    Labor unions maintained pension, annuity, and other benefits funds in trust for their members ("union funds"), and union officials regularly served as trustees of union funds. The union fund trustees, acting as fiduciaries, were responsible for

investing fund assets, and the trustees regularly hired investment advisers to manage those investments.

11.   Wright Investors' Service ("Wright"), headquartered in Milford, Connecticut, was an investment adviser registered with the Securities and Exchange Commission ("SEC") in accordance with the Investment Advisers Act of 1940.   Wright provided investment advisory services to union funds.  Before Wright's incorporation in 1996,  Wright  was  the  trade  name  under  which  The  Winthrop Corporation provided investment advisory services.  After Wright's incorporation, for payroll purposes, Wright's parent, The Winthrop Corporation, employed all of Wright's representatives.

12.   The SEC regulated the activities of investment advisers, including the payment of solicitors, defined by the SEC as "any person who, directly or indirectly, solicits any client for, or refers  any  client  to,  an  investment  adviser,"  17  C.F.R.  § 275.206(4)-3(d)(1). It was unlawful for an investment adviser to pay a cash fee, directly or indirectly, to a solicitor with respect to  solicitation  activities  unless  disclosure  regarding  the solicitor's status was made in accordance with SEC Rule 206(4)-3, 17 C.F.R. § 275.206(4)-3(a)(2).  A willful violation of SEC Rule 206(4)-3 was punishable as a Class D felony.  15 U.S.C. §§ 80b-6 & 80b-17; 18 U.S.C. § 3559(a)(4).

13.   McGinn, Smith & Co., Inc. ("McGinn, Smith"), of Albany, New York, was an investment banking and brokerage firm which, among

other things, for a fee, executed trades of union fund assets as directed by investment advisers.

### Leonard J. Fassler, Jared E. Abbruzzese, and Russell C. Ball

14.   Leonard J. Fassler was an individual associated with Sage Alerting Systems, Inc.; Sage Networks, Inc.; Sage Technologies, Inc.; AmeriData Technologies, Inc.; Sage Equities, Inc.; Interliant, Inc.; and VyTek Wireless, Inc. (collectively referred to as "the Fassler Companies") as well as Microknowledge, Inc. ("Microknowledge") and Routemaster, Inc.

15.   Jared E. Abbruzzese was an individual associated with Communication Technology Advisors LLC; Capital & Technology Advisors LLC; Motient Corporation; TerreStar Networks, Inc.; and Bazaguma LLC (collectively referred to as "the Abbruzzese Companies").

16.   Russell C. Ball was an individual associated with Roadway Contracting Inc. and BB Gardner Management Corporation (collectively referred to as "the Ball Companies").

17.   From time to time, Leonard J. Fassler, Jared E. Abbruzzese, and Russell C. Ball, as well as the Fassler, Abbruzzese, and Ball Companies, and/or companies or entities in which they had or were seeking a financial interest as actual or prospective customers, employers, or associates, were pursuing interests before the Legislature and New York State agencies.

## The Scheme to Defraud

18.   From in or about 1993 and continuing through at least December 2006, in the State and Northern District of New York, defendant JOSEPH L. BRUNO did devise a scheme and artifice to defraud the State of New York and its citizens of the intangible right to his honest services by (a) contacting for personal compensation and enrichment, and (b) entering and attempting to enter into direct and indirect financial relationships with, persons or entities who were pursuing interests before the Legislature or State agencies, and by concealing, disguising, and failing to disclose the existence and nature of such compensated contacts and financial relationships, and the resulting conflicts of interest.

19.   It was a purpose of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO, on behalf of himself or others, would contact persons or entities who had business before the Legislature or State agencies, including union officials, exploiting his official position for personal compensation and enrichment, knowing and believing that his reasonably perceived ability to influence official action would, at least in part, motivate those he contacted to enter into financial relationships beneficial to his personal financial interests.

20.   The State of New York and its citizens paid defendant JOSEPH L. BRUNO a salary for his honest services, but, as a result

of the scheme and artifice to defraud, to their detriment, were deprived of such honest services and instead received dishonest services.

21. It was part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO received payments from the following people and entities:

| Source of Payments | Duration | Approximate Amount |
|---|---|---|
| Wright Investors' Service (related to investment advisory fees paid by union funds) | 1994-2006 | $1,373,069 |
| McGinn, Smith & Co. (related to brokerage fees paid by union funds) | 1993-2005 | $ 632,116 |
| Leonard J. Fassler (through the Fassler Companies) | 1993-2004 | $ 483,000 |
| Jared E. Abbruzzese (through the Abbruzzese Companies) | 2004-2006 | $ 440,000 |
| Russell C. Ball (through the Ball Companies) | 2004-2005 | $ 270,000 |
| **TOTAL** | | **$3,198,185** |

### The Payments From Wright Investors' Service

22. It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO contacted, directly or indirectly, officials at various unions for the purpose of soliciting them to hire Wright as an investment adviser for their benefit funds, including the following:

(A) the International Brotherhood of Teamsters Local 294;

(B)    the Paper Allied-Industrial, Chemical, and Energy International Union;

(C)    the Service Employees International Union Local 200D;

(D)    the Sergeants Benevolent Association;

(E)    the Correction Officers' Benevolent Association, Inc.;

(F)    the Laborers International Union of North America Local 91;

(G)    the International Brotherhood of Teamsters Local 812;

(H)    the Laborers International Union of North America Local 190;

(I)    the Laborers International Union of North America Local 17;

(J)    the Correction Captains' Association, Inc.;

(K)    the New York Hotel Trades Council;

(L)    the International Brotherhood of Teamsters Local 282;

(M)    the International Brotherhood of Teamsters Local 210;

(N)    the Detectives' Endowment Association, Inc.;

(O)    the United Association of Plumbers & Steamfitters Local 773; and

(P)    the International Brotherhood of Teamsters Local 445.

23.    It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO contacted union officials with the knowledge that (i) they represented unions that had interests before the Legislature and New York State agencies, and (ii) they were aware that defendant JOSEPH L. BRUNO, as a New York State Senator and, after January 1, 1995, the Senate Majority Leader, wielded power and influence over the interests their unions had

before the Legislature and New York State agencies.

24.   It was further part of the scheme and artifice to defraud that, on or about March 1, 1994, defendant JOSEPH L. BRUNO and Wright entered into a written agreement providing that Wright would pay defendant JOSEPH L. BRUNO a fee for each investment advisory client Wright opened as a result of a referral by defendant JOSEPH L. BRUNO.

25.   It was further part of the scheme and artifice to defraud that, between in or about 1994 and in or about 1998, defendant JOSEPH L. BRUNO accepted payments from Wright despite the fact that, as required by SEC Rule 206(4)-3, signed and dated acknowledgments of receipt of a written disclosure document were not obtained from union funds solicited or referred by defendant JOSEPH L. BRUNO. According to Wright, "the problem" with obtaining such signed and dated acknowledgments was that "certain trustees object to signing such a form because, they believe, it looks as though they were improperly influenced in their decision to employ Wright[.]"

26.   It was further part of the scheme and artifice to defraud that, in or about August 1998, in order to avoid the need to obtain from the union funds signed and dated acknowledgments of receipt of a written disclosure document, defendant JOSEPH L. BRUNO entered into an agreement with Wright pursuant to which he became a part-time employee of Wright, and, for payroll purposes, he was employed

by The Winthrop Corporation (Wright's parent) ("the August 1998 Employment Agreement").

27. It was further part of the scheme and artifice to defraud that, after he entered into the August 1998 Employment Agreement, defendant JOSEPH L. BRUNO, at the time of the solicitation or referral, routinely failed to disclose his status as an employee to union officials he contacted, as required by SEC Rule 206(4)-3.

28. It was further part of the scheme and artifice to defraud that, after defendant JOSEPH L. BRUNO's direct or indirect contact, the following union funds hired Wright to manage a portion of their assets (collectively referred to as "the Bruno Accounts"):

| Union Benefit Fund | Period of Wright Asset Management |
|---|---|
| International Brotherhood of Teamsters Local 294 Pension Fund (later merged into the New York State Teamsters Conference Fund) and Health and Welfare Fund | 9/94 - 7/03<br><br>9/06 - ongoing |
| Paper, Allied-Industrial, Chemical and Energy Union Industry Union-Management Pension Fund | 4/95 - 5/01 |
| Service Employees Pension Fund of Upstate New York | 10/95 - 2/05 |
| Sergeants Benevolent Association Annuity Plan | 6/98 - 4/03 |
| Corrections Officers' Benevolent Association, Inc. Annuity Fund | 2/99 - ongoing |
| Laborers International Union of North America Local 91 Pension Fund | 1/00 - 1/06 |
| International Brotherhood of Teamsters Local 812 Retirement Fund | 7/01 - 2/04 |

| Laborers International Union of North America Local 190 Pension and Health and Welfare Funds | 5/03 - 10/06 |
| | 5/03 - ongoing |
| Correction Captains Association, Inc. Annuity Fund | 9/05 - ongoing |
| United Association of Plumbers and Steamfitters Local 773 Pension Fund | 8/06 - ongoing |
| Detectives' Endowment Association Annuity Fund | 6/07 - ongoing |

29.   It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO also accepted commissions from Wright in connection with the Upstate New York Hotel & Restaurant Employees Local 471 Pension Fund ("Local 471") account, a fund that had hired Wright as an investment adviser before defendant JOSEPH L. BRUNO had entered into a written agreement with Wright.

30.   It was further part of the scheme and artifice to defraud that, between in or about March 1994 and in or about December 2006, defendant JOSEPH L. BRUNO accepted approximately $1,373,069 in payments from Wright due to his contacts with union officials that resulted in Wright obtaining the Bruno Accounts, and in commissions related to the Local 471 account.

31.   It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO contacted union officials who, on behalf of their unions, had interests before New York State, to solicit them to hire Wright, understanding that his official position as a New York State Senator and the Senate Majority Leader would provide Wright with opportunities to obtain and retain

business from union funds that would not, in the absence of his official position, otherwise have been available.  Other than these contacts with union officials, defendant JOSEPH L. BRUNO did not provide any services to Wright.

32.  It was further part of the scheme and artifice to defraud that, on or about August 31, 1992, defendant JOSEPH L. BRUNO filed a "Certificate of Individual Doing Business Under an Assumed Name" for "Business Consultants."   Although defendant JOSEPH L. BRUNO used the name Business Consultants (which he also referred to as "Business Consultants, Inc." despite the fact that no such entity was ever incorporated), Business Consultants did not perform any real function, and defendant JOSEPH L. BRUNO directed and utilized state employees to perform administrative, clerical, bookkeeping, and legal work related to his outside financial activities.

33.  It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO failed to disclose to the public, his fellow senators, and other government officials that he was contacting union funds on behalf of Wright for personal compensation and enrichment.  Defendant JOSEPH L. BRUNO instead concealed the nature of his role in procuring union fund business for Wright by:

> (A) falsely leading Wright employees and certain union officials to believe that the existence and nature of his financial relationship with Wright and his

14

privately compensated contacts with union officials had been disclosed to the "Senate" Ethics Committee when, in truth and in fact, as defendant JOSEPH L. BRUNO then well knew, (i) he had neither asked for nor received an opinion from the Legislative Ethics Committee regarding his financial relationship with Wright, and (ii) the Legislative Ethics Committee had never been informed that defendant JOSEPH L. BRUNO was contacting union officials on behalf of Wright;

(B) filing annual statements of financial disclosure for years 1993 through 1997 declaring in response to questions four, five, and thirteen that he was employed by "Business Consultants" or "Business Consultants, Inc." as a "consultant" paid "consulting fees" for "consulting" when in truth and in fact as defendant JOSEPH L. BRUNO then well knew, (i) defendant JOSEPH L. BRUNO, in his individual capacity, had entered into a written agreement with Wright, (ii) he was paid as a referral agent for contacting union officials to solicit or refer them to Wright, (iii) he did not provide any consulting services to Wright, (iv) neither Business Consultants nor Business

Consultants, Inc. was a party to the agreement with Wright, and (v) use of the names Business Consultants and Business Consultants Inc. served to conceal or disguise the true source of his income;

(C) filing annual statements of financial disclosure for years 1998 through 2006 declaring in response to questions five and thirteen that he was employed by "the Winthrop Corporation" as a "consultant" paid "salary" for "consulting" when in truth and in fact as defendant JOSEPH L. BRUNO then well knew, (i) he was paid as a referral agent for contacting union officials to solicit or refer them to Wright, and (ii) he did not provide any consulting services to The Winthrop Corporation or to Wright.

34. It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO did take discretionary official action on legislative, funding, contract, and regulatory issues benefitting the interests of labor unions whose officials he had contacted and solicited on behalf of Wright without disclosing the existence and nature of his financial relationships or his contacts for personal compensation and enrichment with those labor unions.

### The Payments from McGinn, Smith & Co., Inc.

35. In or about December 1992, McGinn, Smith, proposed hiring defendant JOSEPH L. BRUNO and, in a letter to defendant JOSEPH L.

BRUNO, which identified McGinn, Smith as investment bankers and investment brokers, stated that defendant JOSEPH L. BRUNO would, among other things, assist in the development of money management relationships with "labor unions, pension plans[.]"

36.   It was further part of the scheme and artifice to defraud that, on or about January 20, 1993, defendant JOSEPH L. BRUNO submitted a written request for an opinion regarding his proposed McGinn, Smith employment to the Legislative Ethics Committee and, in that request, defendant JOSEPH L. BRUNO concealed that he would be contacting labor union officials to develop brokerage business from union funds by omitting from his description of his anticipated duties the words "labor unions, pension funds" and that McGinn, Smith also served as "investment brokers."

37.   It was further part of the scheme and artifice to defraud that McGinn, Smith earned fees as a broker when, as directed by Wright, it traded assets corresponding to three union funds. Wright directed trades to McGinn, Smith pursuant to requests from defendant JOSEPH L. BRUNO; this produced the only revenue that defendant JOSEPH L. BRUNO generated for McGinn, Smith.

38.   It was further part of the scheme and artifice to defraud that, from in or about 1993 through in or about 2005, defendant JOSEPH L. BRUNO obtained from McGinn, Smith a total of $632,116.

39.   It was further part of the scheme to defraud that, on or about March 24, 2000, defendant JOSEPH L. BRUNO incorporated

"Capital    Business    Consultants,    LLC"    ("Capital    Business
Consultants").   Although defendant JOSEPH L. BRUNO used the name
Capital Business Consultants, Capital Business Consultants did not
perform any real function, and defendant JOSEPH L. BRUNO directed
and utilized state employees to perform administrative, clerical,
bookkeeping,  and  legal  work  related  to  his  outside  financial
activities.

40.   It was further part of the scheme and artifice to defraud
that defendant JOSEPH L. BRUNO failed to disclose to the public,
his  fellow  senators,  and  other  government  officials  that  he
obtained brokerage business from union funds on behalf of McGinn,
Smith for personal compensation and enrichment.   Defendant JOSEPH
L. BRUNO  instead  concealed  the  nature  of  his  role  in  procuring
union fund business for McGinn, Smith by:

> (A)   filing  annual  statements  of  financial  disclosure
> for 1993 and 1994 declaring in response to question
> five  that  he  was  employed  by  McGinn,  Smith  as  a
> "part-time  consultant,"  for  "investments,"  when  in
> truth and in fact as defendant JOSEPH L. BRUNO then
> well  knew,  (i)  defendant  JOSEPH  L.  BRUNO  had  only
> obtained union brokerage business, and (ii) he did
> not provide any consulting services; and
>
> (B)   filing  annual  statements  of  financial  disclosure
> for years 1995 through 1999 declaring in response

to questions four, five, and thirteen that he was employed by "Business Consultants" or "Business Consultants, Inc." as a "consultant" paid "consulting fees" for "consulting" when in truth and in fact as defendant then well knew, (i) defendant JOSEPH L. BRUNO was paid by McGinn, Smith, (ii) he had only obtained union brokerage business, (iii) he did not provide any consulting services, (iv) neither Business Consultants nor Business Consultants, Inc. was a party to the agreement with McGinn, Smith, and (v) use of the names Business Consultants and Business Consultants Inc. served to conceal or disguise the true source of his income;

(C) filing annual statements of financial disclosure for years 2000 through 2005 declaring in response to questions five and thirteen that he was employed by "Capital Business Consultants," as a "consultant," paid "consulting fees" for "consulting," when in truth and in fact as defendant then well knew, (i) defendant JOSEPH L. BRUNO was paid by McGinn, Smith, (ii) he had only obtained union brokerage business, (iii) he did not provide any consulting services, (iv) Capital

19

Business Consultants was not a party to the agreement with McGinn, Smith, and (v) use of the name Capital Business Consultants served to conceal or disguise the true source of his income.

### The Payments Directed By Leonard J. Fassler

41.   It was further part of the scheme and artifice to defraud that, from on or about the following dates, the following Fassler Companies entered into agreements with defendant JOSEPH L. BRUNO in his individual capacity or with "Business Consultants," "Business Consultant," or "Capital Business Consultants," (collectively referred to as "the Bruno Companies") to retain defendant JOSEPH L. BRUNO as a "consultant" (collectively referred to as "the Fassler Company Consulting Agreements"):

| Date | Fassler Company | Defendant JOSEPH L. BRUNO/ Bruno Company |
|------|-----------------|------------------------------------------|
| 1/22/93 | Sage Alerting Systems, Inc. | Joseph Bruno |
| 2/19/98 | Sage Networks, Inc. | Joseph L. Bruno Business Consultants |
| 8/26/99 | Interliant, Inc. | Joseph L. Bruno Business Consultants |
| 1/14/00 | Interliant, Inc. | Joseph L. Bruno Business Consultants |
| as of 5/1/00 | VyTek Wireless, Inc. | Joseph L. Bruno Business Consultant |
| 1/19/01 | Interliant, Inc. | Joseph L. Bruno Capital Business Consultants |
| 1/11/02 | Interliant, Inc. | Joseph L. Bruno Capital Business Consultants |

42.   It was further part of the scheme and artifice to defraud that, from in or about 1993 through in or about 2004, defendant JOSEPH L. BRUNO, pursuant to the Fassler Company Consulting Agreements, obtained from Leonard J. Fassler, through the Fassler Companies, a total of $468,000 as follows:

| Year | Fassler Company Making Payments | Amount |
|------|--------------------------------|--------|
| 1993 | Sage Technologies, Inc. | $44,000 |
| 1994 | AmeriData Technologies, Inc. | $48,000 |
| 1995 | AmeriData Technologies, Inc. | $48,000 |
| 1996 | AmeriData Technologies, Inc. | $24,000 |
| 1998 | Sage Networks, Inc. | $44,000 |
| 1999 | Interliant, Inc. | $44,000 |
| 2000 | Interliant, Inc. | $48,000 |
| 2001 | Interliant, Inc.<br>VyTek Wireless, Inc. | $48,000<br>$45,000 |
| 2002 | VyTek Wireless, Inc. | $33,000 |
| 2003 | VyTek Wireless, Inc. | $36,000 |
| 2004 | VyTek Wireless, Inc. | $ 6,000 |

43.   It was further part of the scheme and artifice to defraud that, in or about May 1997, Leonard J. Fassler provided defendant JOSEPH L. BRUNO with a check from Sage Equities, Inc. for $15,000 payable to Business Consultants, Inc., and, in or about May 1997, as requested by Leonard J. Fassler, defendant JOSEPH L. BRUNO provided Leonard J. Fassler with an invoice from "Business Consultants, Inc.," stating that $15,000 was due for services, when

in truth and in fact, as defendant JOSEPH L. BRUNO then well knew, no services had been provided, and "Business Consultants, Inc." had never been incorporated.    In addition to this sham invoice, defendant JOSEPH L. BRUNO provided Leonard J. Fassler with a check in the amount of $10,000 drawn on an account in the name of "Business Consultants, Inc." made payable to "Route Master, Inc." to purchase company stock recommended by Leonard J. Fassler.

44.    It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO did not perform legitimate work commensurate with the payments from Leonard J. Fassler through the Fassler Companies and, as a result, the payments were, in whole or in part, gifts.

45.    It was further part of the scheme and artifice to defraud that, while defendant JOSEPH L. BRUNO was accepting payments through the Fassler Companies, Leonard J. Fassler, and other companies or entities in which he had or was pursuing a financial interest were, from time to time, pursuing interests requiring official action by New York State officials including defendant JOSEPH L. BRUNO.

46.    It was further part of the scheme and artifice to defraud that, in or about March 2000, defendant JOSEPH L. BRUNO, together with Leonard J. Fassler, and another known to the grand jury, through other companies, acquired an ownership interest in Microknowledge, Inc. ("Microknowledge"), an Albany company offering

22

software training services.

47.    It was further part of the scheme and artifice to defraud that, while defendant JOSEPH L. BRUNO had an ownership interest in Microknowledge, Microknowledge had contracts with New York State agencies.

48.    It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO formed "Capital Business Consultants, LLC" in anticipation of the Microknowledge acquisition, and use of the name Capital Business Consultants served to conceal or disguise his ownership interest in Microknowledge.

### The Payments Directed By Jared E. Abbruzzese

49.    It was further part of the scheme and artifice to defraud that, on or about the following dates, the following Abbruzzese Companies entered into agreements with defendant JOSEPH L. BRUNO in his individual capacity or with "Capital Business Consultants" to retain defendant JOSEPH L. BRUNO as a "consultant" (collectively referred to as "the Abbruzzese Company Consulting Agreements"):

| Date | Abbruzzese Company | Defendant JOSEPH L. BRUNO/ Capital Business Consultants |
|------|--------------------|----------------------------------------------------------|
| 2/18/04 | Communication Technology Advisors LLC | Joseph L. Bruno |
| 2/18/04 | Capital & Technology Advisors LLC | Joseph L. Bruno |
| 12/20/04 | Motient Corporation | Capital Business Consultants Joseph L. Bruno, President |

23

| 7/27/05 | TerreStar Networks Inc. | Capital Business Consultants<br>Joseph L. Bruno, President |
|---------|-------------------------|------------------------------------------------------------|

50.   It was further part of the scheme and artifice to defraud that, from on or about March 2, 2004 through on or about August 26, 2005, defendant JOSEPH L. BRUNO, pursuant to the Abbruzzese Company Consulting Agreements, obtained from Jared E. Abbruzzese, through the Abbruzzese Companies, a total of $360,000 as follows:

| Year(s) | Abbruzzese Company Making Payments | Amount |
|---------|------------------------------------|--------|
| 2004 | Communication Technology Advisors LLC | $100,000 |
| 2004 | Capital & Technology Advisors LLC | $100,000 |
| 2005 | Motient Corporation | $120,000 |
| 2005 | TerreStar Networks Inc. | $ 40,000 |

51.   It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO did not perform legitimate work commensurate with the payments from Jared E. Abbruzzese through the Abbruzzese Companies and, as a result, the payments were, in whole or in part, gifts.

52.   It was further part of the scheme and artifice to defraud that, after the new Chief Executive Officer of TerreStar Networks, Inc. terminated its consulting agreement four months early, thereby reducing by $80,000 payments defendant JOSEPH L. BRUNO would receive, Jared E. Abbruzzese agreed, on or about September 1, 2005, to pay, through Bazaguma LLC, defendant JOSEPH L. BRUNO's Mountain View Farm $80,000 for a horse when, in truth and in fact, as

24

defendant JOSEPH L. BRUNO then well knew, (a) the horse was virtually worthless, and (b) Jared E. Abbruzzese gave defendant JOSEPH L. BRUNO this $80,000 gift ($40,000 in cash and $40,000 as forgiveness of debt) to make up for the $80,000 in payments that defendant JOSEPH L. BRUNO, through Capital Business Consultants, had expected to receive from TerreStar Networks, Inc.

53.   It was further part of the scheme and artifice to defraud that, while Jared E. Abbruzzese, through The Abbruzzese Companies, was paying defendant JOSEPH L. BRUNO, from time to time Jared E. Abbruzzese and other companies or entities in which he had or was pursuing a financial interest were pursuing interests requiring official action by New York State officials including defendant JOSEPH L. BRUNO.

## The Payments Directed by Russell C. Ball

54.   It was further part of the scheme and artifice to defraud that, from on or about March 19, 2004 through on or about May 25, 2005, defendant JOSEPH L. BRUNO, pursuant to a consulting agreement between Capital Business Consultants and Roadway Contracting, Inc., obtained from Russell C. Ball, through BB Gardner Management Corporation, a total of $270,000.

55.   It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO did not perform legitimate work commensurate with the payments from Russell C. Ball through BB Gardner Management Corporation and, as a result, the payments were, in whole or in part, gifts.

56. It was further part of the scheme and artifice to defraud that, while BB Gardner Management Corporation was paying defendant JOSEPH L. BRUNO, Russell C. Ball and the Ball Companies, and other companies or entities in which he had or was pursuing a financial interest were, from time to time, pursuing interests requiring official action by New York State officials including defendant JOSEPH L. BRUNO.

## Defendant JOSEPH L. BRUNO's Failure to Disclose Payments from the Fassler, Abbruzzese, and Ball Companies

57. It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO failed to disclose to the public, his fellow senators, and other government officials that he was receiving payments from (a) Leonard J. Fassler, through the Fassler Companies, (b) Jared E. Abbruzzese, through the Abbruzzese Companies, and (c) Russell C. Ball, through the Ball Companies, and instead concealed those payments by:

(A) representing, on separate occasions, to Leonard J. Fassler and Russell C. Ball, that the existence and nature of his financial relationships with each one's companies had been disclosed to the "Senate" Ethics Committee when, in truth and in fact, as defendant JOSEPH L. BRUNO then well knew, he had neither asked for nor received an opinion from the Legislative Ethics Committee regarding his financial relationship with either one's companies;

(B) filing annual statements of financial disclosure

(1)   for years 1993 through 1996 declaring in
      response to questions four, five, and thirteen
      that he was employed by "Business Consultants"
      or "Business Consultants, Inc." as a
      "consultant" paid "consulting fees" for
      "consulting," when in truth and in fact as
      defendant then well knew, (a) defendant JOSEPH
      L. BRUNO was actually paid by the Fassler
      Companies, (b) the payments were pursuant to
      an agreement between Sage Alerting Systems,
      Inc. and defendant JOSEPH L. BRUNO in his
      individual capacity, (c) neither Business
      Consultants nor Business Consultants, Inc. was
      a party to the agreement with Sage Alerting
      Systems, Inc., (d) use of the names Business
      Consultants and Business Consultants Inc.
      served to conceal or disguise the true source
      of his income, and (e) defendant JOSEPH L.
      BRUNO did not provide consulting services
      commensurate with payments he received;

(2)   for years 1997 through 1999 declaring in
      response to questions four, five, and thirteen
      that he was employed by "Business Consultants"
      or "Business Consultants, Inc." as a

"consultant" paid "consulting fees" for "consulting," when in truth and in fact as defendant JOSEPH L. BRUNO then well knew, (a) use of the names Business Consultants and Business Consultants Inc. served to conceal or disguise the true source of his income, and (b) defendant JOSEPH L. BRUNO did not provide legitimate consulting services commensurate with payments he received;

(3) for years 2000 through 2005 declaring in response to question thirteen that "Capital Business Consultants" paid him "consulting fees" when, in truth and in fact as defendant JOSEPH L. BRUNO then well knew, (a) use of the name Capital Business Consultants served to conceal or disguise the true source of his income, and (b) defendant JOSEPH L. BRUNO did not provide legitimate consulting services commensurate with payments he received;

(4) for year 2004 declaring in response to questions four, five, and thirteen that he was employed by "Capital Business Consultants" as a "consultant" paid "consulting fees" for "consulting," when, in truth and in fact as

28

defendant JOSEPH L. BRUNO then well knew,  (a) defendant JOSEPH L. BRUNO, in his individual capacity, had entered into written consulting agreements with Communication Technology Advisors LLC and Capital & Technology Advisors LLC, and (b) Capital Business Consultants was not a party to the agreements with Communication Technology Advisors LLC and Capital & Technology Advisors LLC;

(5) for year 2004 failing to declare that defendant JOSEPH L. BRUNO (through Mountain View Farm) received from Jared E. Abbruzzese (through Bazaguma LLC) a gift in relation to the horse transaction;

(6) for year 2005 failing to declare that defendant JOSEPH L. BRUNO (through Mountain View Farm) received from Jared E. Abbruzzese (through Bazaguma LLC) a gift (in the form of forgiveness of debt) in relation to the horse transaction; and

(7) for years 2004 and 2005, failing to declare his participation, through Mountain View Farm, in a partnership with Jared E. Abbruzzese and others known to the grand jury which owned

29

thoroughbred race horses.

58.   It was further part of the scheme and artifice to defraud that the payments from the Fassler, Abbruzzese, and Ball Companies to defendant JOSEPH L. BRUNO gave Fassler, Abbruzzese, and Ball greater access to the Senate Majority Leader than was available to other citizens of the State of New York.

59.   It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO did take discretionary official action on legislative, funding, contract, and regulatory issues benefitting the interests of Fassler, Abbruzzese, and Ball and/or their related entities without disclosing the existence and nature of his financial relationships with those individuals and entities.

### Efforts to Obtain Business for Asentinel

60.   Asentinel was a Memphis, Tennessee company offering automated expense management of telephone bills.

61.   In or about 2004, Asentinel, in an oral agreement, promised to pay defendant JOSEPH L. BRUNO a percentage of the revenues it received from accounts defendant JOSEPH L. BRUNO introduced.

62.   It was further part of the scheme and artifice to defraud that on or about June 30, 2004, defendant JOSEPH L. BRUNO hosted a meeting at his State Capital office to introduce Asentinel representatives to registered lobbyists and representatives he had invited to attend from New York State agencies and the State

University of New York.  After defendant JOSEPH L. BRUNO introduced Asentinel representatives, Asentinel made a presentation.

63.  It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO knew that the individuals he had contacted to attend the Asentinel presentation (i) represented entities that had business before the Legislature, and (ii) were aware that as a New York State Senator and the Senate Majority Leader defendant JOSEPH L. BRUNO wielded power and influence over the business their entities had before the Legislature.

64.  It was further part of the scheme and artifice to defraud that defendant JOSEPH L. BRUNO failed to disclose that he had a financial interest in business Asentinel obtained as a result of his introduction.

## Wire Communications in Furtherance of the Scheme and Artifice to Defraud

65.  On or about the dates listed below, in the State and Northern District of New York, the defendant, JOSEPH L. BRUNO, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly transmitted and caused to be transmitted in interstate commerce by wire communication certain writings, signs, signals, and sounds, from and to the places listed below:

| Count | Date | From | To | Type of Wire |
|-------|------|------|-----|--------------|
| One | biweekly 1/30/04 through 12/06 | The Winthrop Corporation Milford, CT | Joseph L. Bruno HSBC Checking Account ending in 2574 Albany, NY | instructions and direct deposit of paycheck |
| Two | 8/5/04 | Electronic mail account Albany, NY | Electronic mail account Memphis, TN | Electronic mail message |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

**Mailings in Furtherance of the Scheme and Artifice to Defraud**

66.   On or about the dates listed below, in the State and Northern District of New York and elsewhere, the defendant, JOSEPH L. BRUNO, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly placed and caused to be placed in a post office and authorized depository for mail certain matters, documents, letters, and mailings to be sent or delivered by the United States Postal Service and/or by any private or commercial interstate carrier, to wit, checks delivered by the United States Postal Service, from and to the entities listed below:

| Count | Dates | From | To |
|---|---|---|---|
| **Three** | 8/01/03<br>9/03/03<br>10/07/03<br>11/10/03<br>12/09/03<br>1/08/04<br>2/09/04 | VyTek Wireless, Inc. | Business Consultants |
| **Four** | 3/02/04<br>4/02/04<br>5/03/04<br>6/01/04<br>7/02/04<br>8/05/04<br>9/05/04<br>9/07/04<br>10/04/04<br>11/05/04<br>11/29/04 | Communication Technology Advisors LLC<br><br>Capital & Technology Advisors LLC | Capital Business Consultants |
| **Five** | 1/07/05<br>2/04/05<br>3/24/05<br>4/07/05<br>5/06/05<br>6/02/05 | Motient Corporation | Capital Business Consultants |
| **Six** | 8/18/05 | TerreStar Networks, Inc. | Capital Business Consultants |
| **Seven** | 3/19/04<br>4/20/04<br>5/15/04<br>6/24/04<br>7/19/04<br>8/20/04<br>9/21/04<br>10/18/04<br>12/03/04<br>1/12/05<br>2/16/05<br>3/24/05<br>4/20/05<br>5/25/05 | BB Gardner Management Corporation | Capital Business Consultants |
| **Eight** | 11/17/05 | Bazaguma LLC | Mountain View Farm |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

## Forfeiture Allegations

67.  Paragraphs One through Sixty-six of this Indictment are realleged and incorporated by reference as though fully set forth herein.

68.  As a result of committing one or more of the offenses charged in Counts One through Eight of this Indictment, if convicted, the defendant, JOSEPH L. BRUNO shall forfeit to the United States, pursuant to, Title 18, United States Code, Sections 981(a)(1)(C), 1956(c)(7), and 1961(1), and Title 28, United States Code, Section 2461(c) his interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 1341 (relating to mail fraud) and 1343 (relating to wire fraud), as alleged in Counts One through Eight.

The intent of the United States of America to forfeit such property includes a money judgment representing the total dollar amount derived from said violations.

If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        (a)  cannot be located upon the exercise of due diligence;

        (b)  has been transferred or sold to, or deposited with, a third party,

        (c)  has been placed beyond the jurisdiction of the court;

        (d)  has been substantially diminished in value; or

34

    (e)   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant's up to the value of the forfeiture judgment.


                            A TRUE BILL,

                            Foreperson

ANDREW T. BAXTER
Acting United States Attorney

By:

Elizabeth C. Coombe
Assistant U.S. Attorney

By:

William C. Pericak
Assistant U.S. Attorney